IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| NOBLE MASERU, | : | Case No. 1:18-cv-106 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CINCINNATI, | : | |
| | : | |
| Defendant. | : | |
| | : | |

ORDER DENYING DEFENDANT UNIVERSITY OF CINCINNATI'S
MOTION FOR SUMMARY JUDGMENT (Doc. 56)

This case is before the Court on Defendant University of Cincinnati's Motion for Summary Judgment (Doc. 56), which is fully briefed and ripe for review (*see* Docs. 64, 68). As discussed below, genuine issues of material fact preclude summary judgment. Accordingly, Defendant's motion is **DENIED**.

**FACTS**

This lawsuit stems from the University of Cincinnati's ("UC") decision to not hire Plaintiff Dr. Noble Maseru for an Associate Professor position in UC's Department of Environmental Health – Division of Public Health Policy Services and Management. Dr. Maseru, an African American male, argues that he was discriminated against based on his race and gender.

Prior to applying for the position in 2016, Dr. Maseru had over 30 years of experience in the field of public health. He obtained a Bachelor of Science degree from

Wayne State University in 1979, a Master's degree in Public Health from Emory University School of Medicine in 1981, and a Doctorate in Health Policy from Atlanta University in 1989. In 1994, Dr. Maseru became the Founding Director of the Morehouse School of Medicine's Master of Public Health Program, where he also served as a member of the faculty. In November 2005, Dr. Maseru was hired as the Health Commissioner for the City of Cincinnati's Health Department. He served in this role for over ten years until his retirement in June 2016. During this time, Dr. Maseru was a volunteer professor at UC and an adjunct Associate Professor at Wright State.

At UC, Dr. Maseru helped teach one component of the Master of Public Administration (MPA) program, one component for the medical school, and contributed to two courses at the school of nursing. For each of these courses, Dr. Maseru would help teach one day of classes per semester. Dr. Maseru also served on the Curriculum Committee for UC's nursing school and, in 2006 or 2007, was a member of various committees that helped develop the curriculum and syllabi for UC's newly formed Master of Public Health (MPH) program. Moreover, Dr. Maseru had previously been appointed by UC's President to serve on a committee to address the historic underrepresentation of certain populations at UC. As a volunteer, Dr. Maseru was not paid by UC for his time.

In late 2015, UC posted a position for an Associate/Assistant Professor of Health Policy Management in its Environmental Health Department. The job requirements indicated that the successful candidate would have a strong record of scholarship, funded research, excellence in teaching and advising, and service in the area of public

health. Experience in administration of a graduate program was "highly valued." (Doc. 64-1 at ¶ 15.) A search committee was formed to fill the positions, and Dr. Jun Ying was appointed to chair the committee. The search committee further consisted of (1) Dr. Glenn Talaska, (2) Dr. Aimin Chen, (3) Dr. Barbara Tobias, (4) Dr. Lenisa Chang, and (5) Dr. Judy VanGinkel (the only non-University individual on the committee).

Having recently retired as Health Commissioner, and interested in continuing to work full time in academia, Dr. Maseru applied. A few days after applying, Dr. Maseru met with the committee chair, Dr. Ying for lunch. (Doc. 52 at 4.) At lunch, Dr. Ying shared that he anticipated Dr. Maseru would do a presentation on an area of his choice for the search committee. (Doc. 52 at 27.)

The committee reviewed applications in waves. The first wave had only one applicant. The second wave consisted of six applicants, including Dr. Maseru and the successful candidate, Dr. Jason Turner. For the six candidates in the second wave, the committee predetermined that only three would receive Skype interviews.

The application review process was as follows. Dr. Ying sent the applications and blank scoring sheets to the search committee members for review. Each applicant was assigned scores over numerous criteria. Specifically, two of those scoring criteria are central to this dispute. One score was a recommendation as to whether the applicant should be (1) interviewed, (2) placed on a wait list, or (3) not interviewed. The other score was an "overall rank" reflected on a scale of 0 – 10. A score of 0 represented a poor applicant, a score of 10 denoted an excellent applicant.

While Dr. Ying requested that every committee member provide a score for each

3

applicant, it was not mandatory. Dr. Ying would follow up with the committee members if he did not receive a score sheet for a particular applicant. However, if the committee member still had not provided a score sheet for a particular applicant, Dr. Ying considered it an absent vote. Absent votes were not counted as "zeros" and thus had no negative impact on an applicant's average score. Dr. Ying testified that the primary measurement in deciding who would be selected for an interview was the overall score.

Once the score sheet submission deadline passed, Dr. Ying was responsible for calculating the average score for each individual "based on the score sheets he received." (Doc. 55 at 814.) The top three candidates for wave two were Dr. Jason Turner (average score of 8.25), Dr. Daniel Bergan (average score of 7.5), and Dr. Xiaoxing He (average score of 6). (Doc. 55 at 815-17.) Dr. Maseru scored a 5.5 and was not one of the top three candidates.[1] Drs. Turner and Bergan are Caucasian. Dr. Ying calculated these scores on his own and there was never a meeting to discuss the scoring process. Once Dr. Ying averaged the scores, he informed the committee that Drs. Turner, Bergan, and He would be offered an interview. If a second wave candidate did not make the top three scores, he or she was no longer considered. Consequently, when Dr. Maseru emailed to check on the status of his application, Dr. Ying responded that

---

[1] Dr. Maseru's original overall score was a 4.67. UC concedes, however, that this score did not include a favorable rating of Dr. Maseru from one of the committee members. Dr. Talaska had assigned plaintiff a ranking of 8 and emailed his scoring sheet to Dr. Ying. As he would later testify, Dr. Ying did not see the email and, therefore, the score of 8 was not originally used when calculating Dr. Maseru's overall score. (Doc. 55 at 815-17). When the score of 8 is included in the ranking, Dr. Maseru's overall score increases to 5.5. UC contends that this would still not have placed Dr. Maseru in the top three applicants. Dr. Maseru argues that it would.

4

the search committee had decided not to move forward with his candidacy.

After the second wave of scoring, committee members complained to Dr. Ying that the scoring sheets were too complicated and time consuming. So, for the third wave of applicants, the scoring process was altered: instead of having committee members review applicants, Dr. Ying assumed sole responsibility. After Dr. Ying scored applicants himself, he would notify the committee of the individuals he believed were the top three candidates. Dr. Ying recommended that Drs. Jamie Jenkins, David Chin, and Zhou Chen be offered interviews. Dr. Jenkins is an African American female.[2] Prior to the Skype interview, Dr. He—one of the top three candidates from the second wave—withdrew his name from consideration. Dr. Ying recommended that the vacant interview slot be filled by Dr. Basia Andraka-Christou. She had recently applied, and Dr. Ying forwarded her application to the committee to determine whether they agreed to interview her. Dr. Maseru was not considered to fill the interview spot. Dr. Christou is a Caucasian female.

Ultimately, Dr. Turner was hired for the Associate Professor position. Dr. Turner was working as an Assistant Professor in the Department of Health Management and Policy at St. Louis University, where he taught graduate level courses and served as the Director of the Master of Health Administration Program. Dr. Turner also had eighteen peer-reviewed manuscripts and three peer-reviewed book chapters. The Assistant

---

[2] Dr. Maseru argues that although Dr. Jenkins "identifies as African American," jurors could conclude that Dr. Ying only gave her an overall rating of "6" and recommended her for an interview in an attempt to avoid the appearance of discrimination against Dr. Maseru. UC did not respond to this argument and, in fact, never mentions Dr. Jenkins in its briefings.

Professor position was never filled. Although UC offered it to Dr. Christou, she ultimately declined.

On September 26, 2017, Dr. Maseru completed an intake questionnaire for the Equal Employment Opportunity Commission, which eventually developed into the present lawsuit.

## LEGAL STANDARD

Courts must grant summary judgment if the record "reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). Once the movant has met its initial burden of showing that no genuine issue of material fact remains, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To do so, they must present "significant probative evidence ... on which a reasonable jury could return a verdict" in their favor. *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009). The court "must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir.2007). The court should not resolve factual disputes by weighing conflicting evidence; it is the jury's role to assess the probative value of the evidence. *Anderson*, 477 U.S. at 249.

## ANALYSIS

Dr. Maseru argues that UC discriminated against him on the basis of race and gender. Each argument is assessed in turn below.

6

**I. Race Discrimination**

A plaintiff can prove a claim for discrimination by using either direct or circumstantial evidence. *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 624 (6th Cir. 2013); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973). Since Dr. Maseru concedes there is no direct evidence of discrimination, he must rely on circumstantial evidence. (Doc. 50 at 230-232.) As such, the court must follow the familiar *McDonnell Douglas* burden shifting framework. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015). Under this three-step analysis, a plaintiff must first show a prima facie case of discrimination. If plaintiff can do so, then the defendant must articulate a legitimate, nondiscriminatory reason for its action. If defendant does, then plaintiff must "prove that the given reason is pretext for discrimination." *Ford Motor*, 782 F.3d at 767. If plaintiff cannot, summary judgment is appropriate.

**A. Failure to Hire**

At the outset, the Court notes that its failure to hire analysis is limited only to the Associate Professor position and does not include an analysis of the Assistant Professor position. In his opposition to the present motion, Dr. Maseru newly alleges that he was discriminated against not only for the Associate Professor position, but also the Assistant Professor position that was ultimately offered to, but declined by, Dr. Christou. Principally, Dr. Maseru asks the Court to weigh and pass judgment on his qualifications as compared to those of Dr. Christou. Dr. Maseru's arguments are without merit for two reasons.

First, Dr. Maseru's Complaint alleged he was discriminated against only with

7

respect to UC's selection of an Associate Professor. Dr. Maseru cannot assert a new claim for the first time in opposition to a motion for summary judgment. *See, e.g., Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) ("a non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint.") (citing Federal Practice and Procedure § 2723 (3d ed. Supp. 2005)); *see also Spengler v. Worthington Cylinders*, 514 F.Supp.2d 1011, 1017 (S.D. Ohio 2007) ("a plaintiff may not defeat summary judgment by asserting a claim that he did not plead in the complaint.").

Second, even if it was procedurally proper, Dr. Maseru's argument fails as a matter of law. Although the record is unclear as to how UC intended to fill the Assistant Professor position, there is no evidence that Dr. Maseru applied for that position. (Doc. 50-1 at 295.) Furthermore, the Assistant Professorship was never filled by UC. And as Dr. Maseru himself notes, the relevant standard requires that after rejection, "the position remained open and other similarly qualified individuals who were not members of the protected class *were hired*." *McDonnell Douglas*, 411 U.S. at 802. (emphasis added); *see also, White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005). Therefore, because no candidate was ever hired for the Assistant Professor position, Dr. Maseru is unable to assert a viable "failure to hire" claim for that position. Accordingly, the Court confines its analysis to the Associate Professor position, which was filled by Dr. Turner.

### 1. Plaintiff's Prima Facie Case

To establish a prima facie case for failure to hire, Dr. Maseru must demonstrate that he: (1) is a member of a protected class; (2) applied for a job and did not receive it; (3) was qualified for the job; and (4) was rejected in favor of a similarly situated applicant outside his protected class, or was otherwise treated differently than such applicant. *Jenkins v. Foot Locker Inc.*, 598 Fed. Appx. 346, 349 (6th Cir. 2015).

UC concedes for purposes of this motion that Dr. Maseru satisfies the first three elements. UC nevertheless contends that it is entitled to summary judgment because Dr. Maseru cannot prove the fourth element of his prima facie case. UC does not dispute that Dr. Turner—the successful applicant—is a Caucasian and thus outside of the protected class. Instead, UC argues that because Dr. Maseru and Dr. Turner have different experiences and qualifications, they are not similarly situated. This argument fails since the standard for establishing a prima facie claim is not onerous.

As Dr. Maseru notes, at the prima facie stage, courts should compare the qualifications of two applicants in very general terms, leaving the more rigorous analysis for the later stages of the *McDonnell Douglas* framework. *Philbrick v. Holder*, 583 Fed. Appx. 478, 484 (6th Cir. 2014). And here, UC's in-depth, side-by-side examination of Dr. Turner's and Dr. Maseru's credentials is more relevant to the issue of pretext, rather than whether the applicants were similarly situated. While the two applicants indeed have different qualifications and strengths, they were both evaluated in the same wave of applications and, as outlined further below, had similar qualifications. Dr. Maseru has thus demonstrated a prima facie case of racial discrimination.

9

### 2. Defendant's Legitimate, Non-Discriminatory Explanation

The burden now shifts to UC to articulate a legitimate, nondiscriminatory reason for its hiring decision. UC submits that Dr. Maseru was not interviewed or hired simply because he was not ranked among the top three candidates. The primary reason for this was because UC determined that Dr. Maseru had a "poor record" of academic research, publications, teaching, and administrative experience. (Doc. 68 at 11.) Furthermore, the Associate Professor position was primarily academic. And, unlike Dr. Maseru, Dr. Turner had a strong academic background. He also had prior experience in administration of an academic program which UC "highly valued." (Doc. 64-1 at ¶ 15.) UC has thus proffered a legitimate, nondiscriminatory reason for its hiring decision.

### 3. Pretext

The final step in the *McDonnell-Douglas* framework requires Dr. Maseru to demonstrate that UC's nondiscriminatory explanation is pretextual. A plaintiff can demonstrate pretext by showing that the employer's legitimate, nondiscriminatory reason (1) has no basis in fact, (2) did not actually motivate the employer's decision, or (3) was insufficient to warrant the decision. *Kumar v. Aldrich Chemical Co.*, 911 F.Supp.2d 571, 585 (S.D. Ohio 2012); *see also Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). A plaintiff need only rebut — not disprove — defendant's rationale. *Shazor v. Prof'l Transit Mgmt.*, 744 F.3d 948, 957 (6th Cir. 2014). A plaintiff satisfies this burden by adducing evidence by which a "jury could reasonably reject [the employer's] explanation." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

For two main reasons, Dr. Maseru has raised material questions of fact upon

10

which a reasonable juror could conclude that UC's nondiscriminatory reason is pretextual. First, Dr. Maseru cites evidence that the scoring matrix used during the interview process was "manipulated" by Dr. Ying. Second, a reasonable juror could find that UC's hiring decision was pretextual under the "relative qualifications" test. Each argument is assessed in further detail below.

### (i) Scoring Matrix

Much of this dispute centers around the scoring matrix that Dr. Ying and the hiring committee used to determine which applicants would receive an interview. More specifically, the parties disagree on how the scoring matrix operated. (Doc. 64, Proposed Statement of Undisputed Facts.) UC argues that Dr. Maseru was not hired simply because he was not one of the top three applicants in the second wave; the committee had pre-determined it would only interview the top three applicants, yet Dr. Maseru ranked fourth. UC thus argues that the scoring matrix was the true motivation for its hiring decision—not discrimination.

Dr. Maseru views the evidence differently. He contends that the true reason he was not ranked amongst the top three applicants is because Dr. Ying discriminated against him as an African-American. Specifically, Dr. Maseru argues that applicant rankings were "manipulated" by Dr. Ying. Dr. Maseru's argument is three-fold. First, Dr. Ying did not include Dr. Talaska's favorable ranking of 8 when calculating Dr. Maseru's overall score. As UC admits, this resulted in a score of 4.67, when Dr. Maseru's true score should have been a 5.5. Second, Dr. Ying further ignored another

11

committee member's positive feedback when calculating Dr. Maseru's score.[3] Third, Dr. Maseru contends that Dr. Ying artificially increased Dr. Bergan's overall score to ensure that he was amongst the top three applicants. Dr. Ying disregarded a committee member's suggestion that Dr. Bergan was not even qualified for an interview and, instead, calculated his score of 7.5 based on only two rankings provided by other committee members.[4] If Dr. Ying had factored in the negative comment, Dr. Bergan would not have been amongst the top three candidates.

In other words, Dr. Maseru asserts that Dr. Ying excluded negative comments of other applicants—and thereby inflated those applicant's overall score—yet simultaneously excluded favorable rankings and comments regarding Dr. Maseru. Taken together, Dr. Maseru argues that these unilateral actions by Dr. Ying prevented him from securing a spot among the top three candidates. Dr. Maseru produces a hypothetical chart to demonstrate that, if Dr. Ying had considered these additional factors, Dr. Maseru would have ranked third and thus qualified for an interview. (Doc. 64 at 14.) If Dr. Maseru's view of the evidence is accepted, a reasonable juror could find that UC's nondiscriminatory reason "is not based in fact" and "did not actually motivate [UC's] decision." *Kumar*, 911 F.Supp.2d at 585.

On this point, *Dunlap v. Tennessee Valley Authority*, 519 F.3d 626 (6th Cir. 2008) is

---

[3] Dr. Chang noted that Dr. Maseru "has a lot of positives" and that he "can be a great resource for teaching/mentoring as he knows the area and the university very well." (Doc. 51-1 at 552.) Dr. Maseru contends that these comments were not factored into his overall score. (Doc. 55-1 at 866-67.)

[4] While Dr. Chen provided a scoring sheet for Dr. Bergan, he did not provide an overall rank. In the comments, Dr. Chen noted that Dr. Bergan was not even qualified for an interview. (Doc. 52 at 17) (Doc. 51-1 at 543.)

instructive. There, the TVA's hiring committee predetermined that it would only consider the top ten applicants based on an objective set of scoring criterion. *Id.* at 631. An African American applicant sued, arguing that the TVA subsequently altered its hiring matrix to exclude racial minorities. *Id.* at 628. In response to plaintiff's claims, the TVA offered an identical nondiscriminatory reason as the one here: plaintiff simply did not score high enough on the scoring matrix to move forward in the hiring process. *Id.* Plaintiff, however, presented evidence that the scoring matrix had been changed in contravention of TVA policy, scores varied greatly, and that even the scores of individual applicants were altered to produce a racially biased result. *Id.* The court agreed and found that the TVA's proffered reason was pretextual. *Id.*

The same result in *Dunlap* could follow here. First, it is undisputed that UC changed its scoring process after the second wave of applicants. And, as discussed later, Dr. Maseru has also indicated that Dr. Ying and the hiring committee may have failed to follow UC's Recruitment and Search Guide ("Recruitment Guide") (Doc. 51-1 at 468.). Second, a reasonable juror could find that, while applicants were indeed assigned objective overall scores, those scores did not accurately reflect the qualifications of the applicants. As Dr. Maseru notes, Dr. Ying gave him a low score of 3 but gave higher scores to admittedly unqualified candidates. For example, Dr. Ying gave Dr. Jenkins an overall score of 6. (Doc. 64 at 18.) Yet after her interview, the entire committee agreed that she was unqualified. (*Id.*) As in *Dunlap*, a reasonable juror could thus find that the 0 – 10 score given to each applicant was not actually based in fact or grounded in actual qualifications but was instead influenced by bias or discrimination.

*Dunlap*, 519 F.3d at 631-32. Third, a reasonable juror could find that Dr. Ying's control over the calculation process—which gave him the ability to ignore certain comments or manipulate how the top three scores were formulated—was the actual reason why Dr. Maseru was not ranked amongst the top three applicants. While Dr. Ying testified that the overall 0 – 10 score was the "primary measure" he used in deciding who would receive an interview, Dr. Maseru has presented evidence indicating that Dr. Ying may have altered applicants' scores in order to produce a racially biased result. Just as in *Dunlap*, a reasonable juror could find that UC's proffered reason is pretextual. *See also, e.g., Lam v. University of Hawai'i*, 40 F.3d 1551, 1560 (9th Cir. 1994) (noting that even a single person's bias may be influential in a hiring decision, especially when that person plays a significant role in the selection process) (citing *Gutzwiller v. Fenik*, 860 F.2d 1317, 1327 (6th Cir. 1988)); *see also Stein v. Kent State University*, WL 357752 at *9 (6th Cir. May 11, 1999) ("discrimination at any stage of the academic hiring [] process may infect the ultimate employment decision.").

UC's argument in response is unavailing. UC contends that Dr. Ying simply followed predetermined hiring protocols that were applied equally to all applicants, regardless of race. However, as discussed above, reasonable jurors could find that it was not predetermined, neutral criterion that produced the top three applicants, but rather, Dr. Ying's sole determination of what scores and comments would be factored in and what scores and comments would be ignored. Moreover, the evidentiary record in this case does little to aid UC's argument. The various exhibits, score sheets, and deposition transcripts cited by both parties leave many crucial points unanswered.

14

Notably, Exhibit 24 is disorganized and is unclear on what committee members scored the second wave applicants or even what scores were assigned to each applicant. Although Dr. Ying used the overall score as the primary measure, the record is silent as to whether Dr. Ying was precluded from considering other comments and scores or not when calculating the top three applicants. And Dr. Ying's deposition testimony does little to clear up the ambiguity. (Doc. 55 at 814 – 817.) In other words, the parties have fundamentally different understandings of how the scoring matrix operated, how an applicant's average score should have been calculated, and whether Dr. Maseru could have been amongst the top three applicants or not.

Consequently, Dr. Maseru has pointed to evidence in the record sufficient to raise a dispute of material fact as to pretext. For the reasons above, a reasonable juror could conclude that UC's nondiscriminatory reason—Dr. Maseru's ranking as calculated under the scoring matrix— is "not based in fact" or "did not actually motivate [UC's] decision." *Kumar*, 911 F.Supp.2d at 585.

### (ii) Relative Qualifications of Dr. Maseru and Dr. Turner

Here, even assuming that the scoring matrix was insufficient to meet his burden, Dr. Maseru has identified additional facts upon which a reasonable juror could independently find pretext. The Sixth Circuit has held that, in failure to hire claims, the relative qualifications of the applicants can establish a triable issue of fact as to pretext. *Bartlett v. Gates*, 421 Fed. Appx. 485, 490-91 (6th Cir. 2010). Under this "relative-qualifications test," to escape summary judgment, a plaintiff must produce evidence demonstrating that he was either (1) the "plainly superior candidate, such that no

15

reasonable employer would have chosen" the other applicant, or (2) "as qualified [,] if not better qualified" than the successful applicant, and the record contains "other probative evidence of discrimination." *Id.* (citations omitted); *see also Romano v. Hudson City Sch. Dist.*, 772 Fed. Appx. 258, 266 (6th Cir. 2019). Here, the parties center their arguments around the second mode of proof.

UC contends that while Dr. Maseru may have been qualified, Dr. Turner's qualifications were significantly better. UC argues that Dr. Turner's experience managing a graduate program was "highly valued" and clearly distinguished him from Dr. Maseru, who had "no proof of teaching experience" and a "poor record of academic research and publications, teaching, and administrative experience." (Doc. 68 at 11.) According to UC, no reasonable juror could find that Dr. Maseru was "as qualified" as Dr. Turner. Yet, as discussed below, UC understates Dr. Maseru's prior academic experience—both in teaching and in the "highly valued" enterprise of program administration.

At the outset, the Court notes that it must avoid "acting as a 'super personnel department,' overseeing and second-guessing employers' business decisions." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006) (citations omitted). But even under such limited consideration, the record indicates that a reasonable juror could find that Dr. Maseru was "as qualified" as Dr. Turner.

First, a reasonable juror could conclude that Dr. Maseru and Dr. Turner had similar experience in academic management. Dr. Maseru not only had the "highly valued" experience of managing a graduate program, but he was also the Founding

16

Director of the MPH program at Morehouse College of Medicine. (Doc. 51-1 at p. 303.) Moreover, Dr. Maseru helped create and structure the curriculum of UC's own MPH Program. In comparison, Dr. Turner was the director of a similar program at St. Louis University. Second, a reasonable juror could conclude that Dr. Maseru and Dr. Turner had at least comparable teaching experience. Indeed, Dr. Turner's teaching experience is impressive, as he had previously been an Assistant Professor at St. Louis University where he also taught graduate courses. But contrary to UC's assertions, Dr. Maseru also has extensive teaching experience. As outlined in his CV, Dr. Maseru was a volunteer Associate Professor at UC for eight years, an Adjunct Associate Professor at four different universities, a visiting professor at St. George's School of Medicine, and a visiting lecturer at the University of Michigan. (Doc 51-1 at p. 310-313.) Third, a reasonable juror could conclude that Dr. Maseru's service in the area of public health made him as qualified as Dr. Turner. The job listing for the Associate Professor position included an emphasis on "service in the area of public health." (Doc. 56 at 2.) While the record does not detail Dr. Turner's service in the area of public health, Dr. Maseru was the Health Commissioner for the Cincinnati Health Department for over ten years and was certified at the highest level for public health preparedness. (Doc. 50 at p. 185.)

The Court does not suggest that Dr. Maseru should have been hired for the position. Nor does the Court intend to suggest that Dr. Turner is not qualified for the position. But the relevant legal analysis requires that the Court evaluate whether Dr. Maseru had sufficient experience for a juror to consider him "as qualified" as Dr. Turner. The Court finds that he does.

Since Dr. Maseru has demonstrated that he was at least "as qualified" as Dr. Turner, summary judgment should be denied so long as Dr. Maseru can point to other probative evidence of discrimination. Dr. Maseru makes two arguments in support.

First, Dr. Maseru details the "severe" underrepresentation of African Americans in the Department. Dr. Maseru notes that he was appointed by UC's president to serve on a committee to address the historic underrepresentation of minority populations at UC. Yet despite the work Dr. Maseru and the committee completed, there were still zero African Americans in the Department as late as 2016. And while UC states that it is "committed to diversity in its faculty and staff," Dr. Maseru notes that the statistics tell a different story: only 1% of Department employees (or 2 out of 187) are African American. In response, UC asks the Court to disregard these statistics as evidence of pretext because Dr. Maseru was scored by criterion alike to members of all races. Simply, it was Dr. Maseru's lesser qualifications that resulted in a low score, not an underrepresentation of African Americans in the Department. But as outlined above, reasonable jurors may find that the calculation of the top three scores was either not based in fact or was not the actual reason that motivated UC's decision. Likewise, reasonable jurors could find that UC's hiring decision here was consistent with the systemic underrepresentation in the Department.

Second, Dr. Maseru notes that the deviation from normal hiring practices may be evidence of improper motive. *See Skalka v. Fernald, Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 422 (6th Cir. 1999) (holding that jury was entitled to find discriminatory conduct when an employer "lost" ranking forms and deviated from its normal hiring

18

procedures). And here, Dr. Maseru details how the hiring committee and Dr. Ying failed to follow UC's Recruitment Guide, which required committees to consider and hire applicants from minority and underrepresented populations. UC's Recruitment Guide requires that an Equal Opportunity Coordinator be assigned to monitor the recruitment and hiring process. But that was not done here. The Recruitment Guide also requires that "every reasonable effort be made" to compose a search committee that "include[es] members who are People of Color." (Doc 51-1 at p. 472.) Yet here, there were no African Americans on the search committee. Finally, the Recruitment Guide directs hiring committees to use "previously agreed upon criteria and screening procedures." But as described above, the process was altered for the third wave of applicants.

In sum, when the evidence is taken in its entirety and cast in a light most favorable to Dr. Maseru, he has shown that he can meet his burden of demonstrating pretext. Because Dr. Maseru raises genuine disputes of material fact—with regard to both the scoring matrix and the applicability of the "relative qualifications test"— summary judgment is inappropriate. As such, UC's Motion for Summary Judgment as to Dr. Maseru's race discrimination claim is **DENIED**.

**II. Gender Discrimination**

Although UC also moves for summary judgment on Dr. Maseru's gender discrimination claim, the briefings do not clearly distinguish between the race and gender standards. UC further fails to adequately identify material facts or relevant case law that would support its position. Without the benefit of meaningful briefing

19

regarding the claim, the Court must deny the motion for summary judgment on Dr. Maseru's gender discrimination claim.

## CONCLUSION

In sum, UC's argument for summary judgment fails because a reasonable juror could find that its legitimate, nondiscriminatory reason for not hiring Dr. Maseru is pretextual. Accordingly, its motion (Doc. 56) is **DENIED**. This case will proceed to trial on both the race and gender discrimination claims.

**IT IS SO ORDERED.**

> UNITED STATES DISTRICT COURT
> SOUTHERN DISTRICT OF OHIO
>
> By: */s/ Matthew W. McFarland*
> JUDGE MATTHEW W. McFARLAND